UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAFALGAR POWER INC. and
CHRISTINE FALLS CORPORATION,

       Plaintiffs,
  vs          5:99-CV-1238
             (Lead Case)
AETNA LIFE INSURANCE COMPANY;
ALGONQUIN POWER CORPORATION,
INC.; ALGONQUIN POWER INCOME
FUND; and ALGONQUIN POWER FUND
(CANADA) INC.;
       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALGONQUIN POWER CORPORATION, INC.;
ALGONQUIN POWER INCOME FUND; and
FRANKLIN INDUSTRIAL COMPLEX, INC.;

       Plaintiffs,
  vs          5:00-CV-1246
             (Member Case)
TRAFALGAR POWER, INC.; CHRISTINE
FALLS CORPORATION; and PINE RUN OF
VIRGINIA, INC.;
       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE:
MARINA DEVELOPMENT, INC.; FRANKLIN INDUSTRIAL COMPLEX, INC.; CHRISTINE FALLS OF NEW YORK, INC.; TRAFALGAR POWER, INC.; PINE RUN OF VIRGINIA, INC.;

Debtors

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARINA DEVELOPMENT, INC.; TRAFALGAR POWER, INC.; CHRISTINE FALLS OF NEW YORK, INC.; FRANKLIN INDUSTRIAL COMPLEX, INC.; and PINE RUN OF VIRGINIA, INC.;

Plaintiffs,

vs

ADV. PRO. NO. 02-80005

ALGONQUIN POWER CORPORATION, INC.; ALGONQUIN POWER SYSTEMS, INC.; ALGONQUIN POWER FUND (CANADA), INC.; ALGONQUIN POWER INCOME FUND; ALGONQUIN POWER SYSTEMS NEW HAMPSHIRE, INC.; ALGONQUIN POWER (U.S.) HOLDINGS, INC.; AETNA LIFE INSURANCE COMPANY; CIT CREDIT GROUP, INC., fka NEWCOURT CREDIT GROUP, INC.; CANADIAN INCOME PARTNERS I LIMITED PARTNERSHIP;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
| --- | --- |
| HARRIS BEACH & WILCOX, LLP<br>Attorneys for Trafalgar Power Parties<br>The Granite Building<br>130 East Main Street<br>Rochester, NY 14604-1687 | JOSEPH D. PICCIOTTI, ESQ.<br>PAUL J. YESAWICH, III, ESQ. |
| NIXON PEABODY, LLP<br>Attorneys for Aetna Life Ins. Co.<br>P.O. Box 1051<br>Rochester, New York 14603-1051 | ROBERT B. CALIHAN, ESQ.<br>ANDREW M. BURNS, ESQ. |

MENTER RUDIN & TRIVELPIECE    MITCHELL J. KATZ, ESQ.
Attorneys for Algonquin Power Parties
500 South Salina Street
Syracuse, New York 13202

RACKEMANN SAWYER & BREWSTER    J. DAVID LESLIE, ESQ.
Attorneys for Algonquin Power Parties    ERIC A. SMITH, ESQ.
One Financial Center    BRIAN M. HURLEY, ESQ.
Boston, MA 02111

HANCOCK & ESTABROOK, LLP    STEPHEN A. DONATO, ESQ.
Attorneys for Marina Development Parties (Debtors)
1500 MONY Tower I
P.O. Box 4976
Syracuse, New York 13221-4976

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

### A. Lead Case

Trafalgar Power, Inc. and Christine Falls Corporation[1] (collectively "TPI") filed a complaint on August 9, 1999. On January 11, 2000, TPI filed an amended complaint alleging breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and conversion causes of action against Aetna Life Insurance Company ("Aetna") and breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, tortious interference with contract, and conversion causes of action against Algonquin Power Corporation, Inc., Algonquin Power Income Fund, and Algonquin Power Fund (Canada) Inc. (collectively "Algonquin"). Algonquin counterclaimed for money allegedly due. The details

---

[1] Christine Falls Corporation is wholly owned by Trafalgar Power, Inc.

regarding these claims will be addressed below. Jurisdiction was based on diversity of citizenship and TPI sought, inter alia, compensatory damages of $20 million, well over the jurisdictional amount. See 28 U.S.C. § 1332.

### B. Member Case

On August 15, 2000, Algonquin Power Corporation, Inc. and Algonquin Power Income Fund filed suit against Trafalgar Power, Inc., Christine Falls Corporation, Pine Run Virginia, Inc. ("Pine Run"), and American Casualty Company of Reading, Pennsylvania.[2] Claims sounding in conversion and fraud were alleged. Again, details of the claims will be discussed below. Diversity of citizenship and a claim for damages over the jurisdictional amount provide the basis for jurisdiction. See 28 U.S.C. § 1332.

### C. Adversary Proceeding

TPI, Pine Run, and other affiliated entities filed for bankruptcy protection in 2001. Shortly after filing their bankruptcy petitions, debtors initiated an adversary proceeding against Algonquin, Aetna, and others. Debtors asserted a total of nineteen claims, several of which were duplicative of the claims asserted in the Lead and Member Cases just described. Specifically, Counts 7, 8, 9, 10, 11, 12, and 13, as well as Counts 14 and 15 to the extent that they involve power projects in New York, of the adversary proceeding complaint duplicated claims set forth in the lead and member cases. Thus, in accordance with the Report and Recommendation of the Bankruptcy Court, the reference was withdrawn with regard to Counts 7, 8, 9, 10, 11, 12, and 13, as well as Counts 14 and 15 to the extent that

---

[2] By stipulation of the parties on February 9, 2001, the claims against American Casualty Company of Reading, Pennsylvania were discontinued.

they involve power projects in New York. The remaining bankruptcy matters are being held in abeyance pending a determination on these motions.

### D. Current Status of Cases/Pending Motions

The lead case and the member case were consolidated on November 8, 2000. At the time the reference was withdrawn on Counts 7-13 and 14-15 (to the extent that New York power projects are implicated) of the adversary proceeding on November 7, 2003, those Counts were consolidated with the Lead Case.

Presently pending are Algonquin's and Aetna's motions for partial summary judgment[3] and TPI's motion for partial summary judgment all of which were filed in the adversary proceeding, the reference of which was withdrawn. An in-chambers conference was held on June 21, 2004, in Utica, New York. Decision on the pending motions was reserved.

On April 13, 2005, TPI moved for leave to supplement the record on summary judgment. Algonquin and Aetna opposed. The motion was taken on submission without oral argument.

Also pending is TPI's appeal of the Magistrate Judge's Order striking its demand for a jury trial. Algonquin filed a response, and TPI replied. The appeal was taken on submission without oral argument.

## II. FACTS

The following facts are undisputed unless otherwise noted. In 1988, TPI financed the construction and operation of seven hydroelectric power plants in New York

---

[3] Algonquin and Aetna seek a judgment dismissing all claims related to the B Note, one of the loans TPI obtained from Aetna, as will be discussed in more detail below. There are no motions with regard to claims related to the other such loan, the A Note.

- 5 -

State ("power projects") by taking out a loan in the principal amount of $22,500,000 from Aetna ("Aetna loan"). TPI pledged substantially all of its assets, including the power projects, as collateral.

In 1989, TPI commenced a lawsuit against the engineering firm that designed the power projects, alleging engineering malpractice regarding the design of the power projects as it related to the projected power generation potential (and income generation). This lawsuit was successful and TPI eventually obtained a judgment in the amount of $7.6 million ("malpractice judgment"). See generally Hydro Investors v. Trafalgar Power, Inc., 63 F. Supp. 2d 225 (N.D.N.Y. 1999) (denying post-trial motions), aff'd in part, vacated & remanded in part, 227 F.3d 8 (2d Cir. 2000) (vacating denial of prejudgment interest and remanding for calculation of such interest).

Meanwhile, TPI defaulted on the Aetna loan, and on January 19, 1995, Aetna notified TPI of the default and its intent to accelerate the entire balance immediately due and to foreclose on the collateral. At that time the entire principal amount of $22,500,000 was owed, as was $10,199,659.50 in accrued interest.

Negotiations took place to restructure the loan. Aetna required that TPI hire an operator/manager for the power projects as a pre-condition to any restructured loan. Accordingly, TPI hired Algonquin to operate and manage the power projects. Algonquin began managing the power project operations in June 1995.

TPI and Aetna reached an agreement to restructure TPI's debt. The original $22,500,00 Aetna loan was cancelled and the interest owed was forgiven. Two new notes were issued as a result of the January 15, 1996, agreement to restructure ("1996 Agreement"). The "A Note" was in the principal amount of $6,700,000, bearing interest at

- 6 -

9.75% per annum, and maturing on February 10, 2003. The "B Note" was in the principal amount of $15,800,000, bearing interest at 6.10% per annum, and maturing on December 31, 2010. Apparently contemplating a future offer by Algonquin to purchase the notes, a right of first refusal on behalf of TPI was included in the 1996 Agreement. The 1996 Agreement provided that if Algonquin made an offer to purchase the A Note or the B Note, TPI would have the right to purchase such Note at 105% of the offered purchase price and in accordance with any terms set forth in Algonquin's offer. This provision, drafted by TPI's counsel, states the following:

> If Lender shall receive an offer from Algonquin Power Corporation, Inc. or any of its affiliates (collectively, "Algonquin") to purchase all or any portion of the Notes, or if Lender shall otherwise enter into any agreement or arrangement (or series of agreements or arrangements) with Algonquin for the sale of all or any portion of the Notes, whether by assignment or otherwise, Lender shall promptly deliver a copy of any such offer or purchase agreement to Borrowers ("Lender's Notice"), together with Lender's statement that it is prepared to sell the Notes on the terms set forth in Lender's Notice. In connection therewith, Borrowers or Trafalgar acting on behalf of Borrowers, shall have the right and option to purchase the Notes or the portion thereof described in Lender's Notice, at a price equal to one hundred and five percent (105%) of the purchase price set forth in Lender's Notice on the terms set forth therein. Such option shall be exercised by notice given to Lender (the "Notice of Exercise") within thirty (30) days after Borrowers' receipt of Lender's Notice, accompanied by a certified or bank check for Fifty Thousand Dollars ($50,000.00) as a deposit towards the purchase price (the "Deposit"). If such right of first refusal is not exercised by Borrowers or Trafalgar as aforesaid, such right shall terminate and be of no further force or effect. If such right is exercised as aforesaid, the Notes covered by Lender's Notice shall be sold and transferred to Trafalgar or its nominee on the date specified in the Notice of Exercise, which date shall be not less than ten (10) or more than sixty (60) days after the giving of the Notice of Exercise. On or before such sale date, the balance of the purchase price shall be paid to Lender by wire transfer of funds, or by certified or bank check.

(Am. Compl. Ex. A ¶ 15(a).) The 1996 Agreement also contained a waiver of the right to a jury trial. This provision states:

> Waiver of Right to Jury Trial. NEITHER BORROWERS OR LENDER (NOR ANY SUCCESSOR OR ASSIGN OF EITHER OF THEM) SHALL SEEK A JURY TRIAL IN ANY ACTION BASED UPON OR ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE LOAN, ANY OF THE OTHER FINANCING DOCUMENTS, ANY RELATED OBLIGATIONS OF ANY GUARANTOR, OR THEIR DEALINGS OR RELATIONSHIPS WITH EACH OTHER. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWERS AND LENDER EACH HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ANY AND ALL RIGHT TO ANY SUCH JURY TRIAL AND AGREE THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS SECTION HAS BEEN FULLY DISCUSSED BY BORROWERS AND LENDER, EACH OF WHOM HAS BEEN REPRESENTED BY COUNSEL, AND THIS SECTION SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.

Id. ¶ 17. Finally, the 1996 Agreement provides that the state laws of Connecticut be used in any construction, interpretation, enforcement, and governance of the 1996 Agreement. Id. ¶ 16(e).

On November 27, 1996, Aetna notified TPI that an offer from Algonquin to purchase the entire B Note had been received. (See Aetna Ex. 13.) Aetna's letter stated that it was intended to constitute a "Lender's Notice" as contemplated by paragraph 15 of the 1996 Agreement. Attached was the Term Sheet, setting forth the terms of Algonquin's offer to purchase the B Note. The Term Sheet set forth a purchase price of $94,000. It provided an intercreditor agreement under which Algonquin agreed not to exercise its rights as creditor or remedies as the holder of the B Note against TPI without the consent and approval of Aetna, so long as TPI remained indebted to Aetna. It also provided that the sale transaction

"shall be evidenced by such instruments and agreements as Aetna deems necessary, in its reasonable discretion." Id.

On November 29, 1996, TPI notified Aetna of its intent to exercise the right of first refusal, via a letter from TPI's sole shareholder Arthur Steckler ("Steckler"). Id. Ex. 14. On December 17, 1996, TPI's counsel sent Aetna a letter formally giving notice that TPI was exercising its right to purchase the B Note. Id. Ex. 15.  This letter stated that the note would be taken in the name of TPI's nominee First Dominion Properties, Inc. ("First Dominion") "on February 11, 1997." Id.  Enclosed with the letter was a bank check for $50,000 and the letter noted that the "balance of the purchase price w[ould] be paid on or before February 11, 1997." Id.

Aetna asserts that between December 17, 1996, and January 24, 1997, its counsel prepared drafts of the necessary documents to complete the sale of the B Note to TPI, and that on January 24, 1997, it forwarded these documents to TPI's counsel.  Included was a draft Loan Purchase and Sale Agreement that specifically set forth a closing date of "not later than February 11, 1997 (time being of the essence)." Id. Ex. 20 at 2.  Aetna further asserts that between January 24, 1997, and February 11, 1997, its counsel attempted to contact counsel for TPI by sending several letters and placing several telephone calls regarding the proposed sale.  Then-counsel for TPI stated that he had no recollection of receiving Aetna's January 24, 1997, letter, and a search of his law firm's records did not uncover such a letter.  TPI's counsel also stated that he did not recollect receiving telephone calls from Aetna's counsel.

In any event, February 11, 1997, came and went with no transaction taking place.  On February 12, 1997, Aetna's counsel sent a letter to TPI's counsel advising that

TPI's right of first refusal expired. Then, on February 17, 1997, Steckler personally delivered to Aetna a bank check in the amount of $48,700 representing the balance of the purchase price pursuant to the Notice of Exercise. The accompanying letter requested delivery of the B Note to TPI's nominee, First Dominion.

On February 19, 1997, Aetna's counsel notified TPI by letter to its counsel that TPI's right to purchase the B Note expired on February 11, 1997, when it failed to complete the purchase on that day. Aetna returned the $48,700 check. However, Aetna retained the $50,000 deposit.

The purchase of the B Note by Algonquin was completed on March 27, 1997, pursuant to the terms set forth in the Term Sheet. Eventually the B Note was assigned to Algonquin Power Income Fund. Thereafter Aetna sold the A Note to Algonquin. (See Aetna Answer ¶ 36.)

On July 1, 1999, the Internal Revenue Service issued a Notice of Intent to Levy to TPI due to TPI's failure to pay tax. This constituted a default under Note B, according to Algonquin. Accordingly, Algonquin notified TPI of the default and upon TPI's failure to remedy it, Algonquin accelerated the debt.

This prompted TPI to file the Lead Case, on August 9, 1999. In the Lead Case, TPI alleges <u>seven</u> causes of action in the Amended Complaint, as follows. The <u>first cause of action</u> was brought against Aetna, alleging breach of contract with regard to Aetna's refusal to transfer possession of the B Note to TPI and failing to give TPI the required notice and opportunity to exercise the right of first refusal with regard to the A Note. The <u>second cause of action</u>, also against Aetna, alleges breach of the duty of good faith and fair dealing, again with regard to Aetna's refusal to transfer possession of the B Note to TPI and failing to give

TPI the required notice and opportunity to exercise the right of first refusal with regard to the A Note.  The third cause of action is for specific performance, in other words to require Aetna and Algonquin to transfer the A and B Notes to TPI.  The fourth cause of action alleges that Aetna breached its fiduciary duty by conspiring with Algonquin to refuse TPI's exercise of the right to purchase the B Notes and to refuse to offer TPI the right to purchase the A Note.  The fifth cause of action alleges that Algonquin tortiously interfered with the contract between Aetna and TPI regarding the A and B Notes.  The sixth cause of action alleges that Aetna and Algonquin converted the property, the B Note, of TPI.  Finally, the seventh cause of action alleges that Algonquin, as manager of the power projects, had a fiduciary duty to TPI which it breached by converting assets of TPI and using those assets to purchase the B Note.  TPI sought compensatory damages exceeding $20 million, specific performance regarding the A and B Notes, and punitive damages.  Further, TPI demanded a jury trial.

Algonquin counter claimed for a judgment declaring that it has a right to hold the A and B Notes, TPI's failure to pay income taxes due constituted a default under the A and B Notes, all outstanding principal and interest on the A and B Notes is presently due, TPI is in default with regard to the Notes, and Algonquin is entitled to exercise its rights as against the collateral.  Algonquin also seeks the amount due under the Notes.

On December 22, 1999, TPI assigned its $7.6 million malpractice judgment to Pine Run.  Pine Run is owned by Marina Development, Inc. ("Marina").  Marina also owns TPI and a power project in New Hampshire (Franklin Industrial Complex, Inc.).  Marina is owned by Steckler.

On August 15, 2000, Algonquin filed the Member Case.  In its Amended Complaint Algonquin asserts six causes of action.  In the first cause of action, Algonquin

alleges that TPI and Pine Run converted property (the malpractice judgment) because the malpractice judgment was collateral to which Algonquin was entitled to apply toward TPI's outstanding debt. The second cause of action sets forth a constructive fraud claim pursuant to the N.Y. Debt. & Cred. Law § 273, based upon the conveyance of the malpractice judgment from TPI to Pine Run allegedly for less than fair consideration. The third cause of action alleges that the conveyance of the malpractice judgment was made with the intent to hinder, delay, or defraud Algonquin, a creditor, in violation of N.Y. Debt. & Cred. Law § 276. The fourth cause of action alleges intentional fraud in conveying the malpractice judgment while knowing TPI was unable to pay its debts, also in violation of N.Y. Debt. & Cred. Law § 276. The fifth cause of action alleges that pursuant to N.Y. C.P.L.R. Article 71 through Fed. R. Civ. P. 64, Algonquin is entitled to possession of the judgment as collateral to apply toward TPI's outstanding debt. Finally, the sixth cause of action is for attorneys fees pursuant to N.Y. Debt. & Cred. Law § 276-a. Algonquin seeks reassignment of the malpractice judgment or an award of the proceeds of the malpractice judgment to Algonquin, to set aside the conveyance of the malpractice judgment, possession of the malpractice judgment, and attorneys fees and costs.

      On January 16, 2001, Algonquin was granted a preliminary injunction precluding TPI from assigning or otherwise disbursing the malpractice judgment, conditioned upon Algonquin posting a $2,000,000 bond. Proposed orders were to be submitted. On February 2, 2001, a Stipulation and Order was entered providing that the proceeds of the malpractice judgment ($9,975,726.61) be placed in escrow, and that no funds from the escrow account be released except upon the order of the Court. A further Order was entered on February 14, 2001, preliminarily enjoining TPI from assigning or otherwise disbursing

proceeds of the malpractice judgment and again requiring that Algonquin post a bond. Algonquin timely posted the required bond.[4]

On May 2, 2001, Hon. David E. Peebles, United States Magistrate Judge, granted Algonquin's motion to strike TPI's jury demand. TPI appealed, and that appeal is currently ready for decision.

In September 2001 proceedings in the consolidated cases were stayed as a result of TPI filing for bankruptcy protection pursuant to Chapter 11 in the Eastern District of North Carolina. Venue for the bankruptcy case and related adversary proceedings was transferred to the Northern District of New York in April 2002.

On May 23, 2002, an Order was entered directing the release and transfer of the escrowed malpractice judgment funds pursuant to the stipulation of the parties. This Order dissolved the preliminary injunction and directed the transfer of the funds to an escrow account maintained under the jurisdiction of the bankruptcy court.

## III. DISCUSSION

The pending motions and appeal are set forth in the introduction above. The parties submitted a statement of the issues in early June 2004 at the Court's direction. Upon review of these submissions and the entire record in this matter, it is apparent that the central issue is whether TPI properly exercised its right to purchase thus entitling it to the B Note. Every cause of action at issue regarding the B Note rests upon the propriety of TPI's attempt to exercise its right to purchase. However, TPI argues that in order to answer this central question, additional discovery is necessary so that it may supplement the record. Accordingly, TPI's motion to supplement the summary judgment record will be addressed

---

[4] TPI brought an interlocutory appeal of that Order, which it later voluntarily withdrew.

first. Then the parties' summary judgment motions and the jury trial issue will be addressed as necessary.

### A. TPI Motion to Supplement the Record

TPI argues that in litigation relating to the New Hampshire power project, disclosures have indicated that "Algonquin also abused it fiduciary relationship" with Steckler, managing the plant for its benefit rather than for Steckler, and "manufactured a default under the debt it improperly acquired from another lender." (Yesawich Letter 6-11-04 at 2.) TPI asserts that Algonquin's conduct relating to the New Hampshire power project, revealed in that litigation, was part of a "scheme to obtain ownership of all" of Steckler's power projects and the proceeds of the malpractice judgment. TPI argues that in light of Algonquin's conduct relating to the New Hampshire power project, additional information is needed to uncover its conduct relating to the New York power projects that are the subject of this litigation.[5]

It is clear that whatever Algonquin's conduct was with regard to the New York power projects, which might be revealed by further discovery, will have no bearing on the central question of whether TPI properly exercised its right of first refusal pursuant to the requirements of the 1996 Agreement. What is needed to answer that question is the facts of what TPI did in its effort to purchase the B Notes, which are undisputed, applied to the contractual requirements. In other words, did TPI do what the 1996 Agreement required? Algonquin's conduct with respect to the New Hampshire power project, any "scheme to

---

[5] Indeed, apparently TPI served approximately four to five subpoenas upon various banks to provide cancelled checks for all transaction activity from Algonquin entities from 1/15/1996 to present. (See Docket Text Entry 7-25-05.) Algonquin objected, and the parties were directed to resolve the issue between them, involving the court only if they could not reach a resolution. Id.

obtain ownership," and/or any manufacturing of a default is simply irrelevant. Accordingly, TPI's motion to supplement the summary judgment record will be denied.

### B. Summary Judgment Motions

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).

As just was noted, the material facts are not at issue here. What remains is purely an issue of law: did TPI meet the requirements of the 1996 Agreement in attempting to exercise its right of first refusal to purchase the B Note. See Thompson & Peck, Inc. v. Harbor Marine Contracting Corp., 203 Conn. 123, 130-31, 523 A.2d 1266, 1270 (Conn. 1987) (stating that the parties' intentions are to be derived from the definitive language of the contract as a matter of law). If TPI comported with the 1996 Agreement's requirements, then issues regarding TPI's causes of action, such as whether Aetna and Algonquin breached fiduciary duties and fraudulently prevented TPI from taking possession of the B Note, remain for determination. However, if TPI failed to comply with the requirements for exercising its first refusal rights, then the transfer to Algonquin was proper and the story is ended.

The 1996 Agreement required that Aetna notify TPI if it received a purchase offer from Algonquin. This notice was required to contain a Term Sheet, which constituted the terms of the purchase offer made by Algonquin. On November 27, 1996, Aetna notified TPI that Algonquin had made an offer to purchase the B Note. The notice included a copy of the Term Sheet, setting forth the terms of Algonquin's offer.

The 1996 Agreement required a Notice of Exercise by TPI within 30 days. On December 17, 1996, TPI sent a Notice of Exercise to Aetna. There is no dispute that the Notice of Exercise was timely. The 1996 Agreement required that the Notice of Exercise be accompanied by a deposit in the form of a certified or bank check for $50,000.00. There is no dispute that TPI's Notice of Exercise was accompanied by a bank check in the amount of $50,000.00 constituting its deposit toward the purchase.

The 1996 Agreement required that the Notice of Exercise specify a sale date, "not less than ten (10) or more than sixty (60) days after the giving of the Notice of Exercise." (Am. Compl. Ex. A ¶ 15(a).) TPI's Notice of Exercise specified a sale date of February 11, 1997. There is no dispute that February 11, 1997, was more than ten and less than sixty days after the Notice of Exercise.

The 1996 Agreement required that the balance of the purchase price be paid to Aetna "[o]n or before such sale date." Id. Steckler (on behalf of TPI and its nominee First Dominion) tendered the balance of the purchase price to Aetna on February 17, 1997, clearly after the sale date (February 11, 1997) specified in the Notice of Exercise. TPI therefore forfeited its right to purchase the B Note and Aetna was free to sell it to Algonquin in accordance with the terms set forth in the Term Sheet.

TPI argues that paragraph 15 of the 1996 Agreement should be read to mean that so long as the purchase was completed within sixty days of the Notice of Exercise, it did not forfeit its right to purchase. However, the 1996 Agreement is clear: "the Notes covered by Lender's Notice shall be sold and transferred to Trafalgar or its nominee <u>on the date specified in the Notice of Exercise</u>, which date shall be not less than ten (10) or more than sixty (60) days after giving of the Notice of Exercise. On or before such sale date, the

- 16 -

balance of the purchase price shall be paid." Id. (emphasis added). There is no ambiguity here--the contract must be "given effect according to its terms." Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P., 252 Conn. 476, 498, 746 A.2d 1277, 1288 (Conn. 2000). To read the 1996 Agreement, as TPI suggests, to mean that the date of sale could be on any day within the ten-to-sixty-day window would render meaningless the requirement that a sale date be set forth in the Notice of Exercise. If the parties had intended for the sale to take place on any one of those fifty days between the tenth and sixtieth day (with no prior warning), they could have written that into the agreement. It strains the imagination to even consider that they may have contemplated a sale with no set date for closing but rather a fifty-day open window for completing the sale. These were "commercially sophisticated" parties that drafted the 1996 Agreement after much negotiation and with the advice of counsel. See id. at 496, 746 A.2d at 1287. Their words will be given effect.

TPI argues that the 1996 Agreement did not clearly specify that its right to purchase would be forfeited if the purchase were not completed by the date specified in the Notice of Exercise, referencing subparagraph (b). This provision states that "[i]f Trafalgar or its nominee shall not have purchased the notes within the time period and on the terms set forth above, the Deposit shall be forfeited to Lender, and Lender shall have the right to sell the Notes . . to Algonquin." (Am. Compl. ¶ 15(b).) This provision, when considered with the language of the previous subparagraph clearly indicated the parties' intent that should the sale not be completed on the sale date set forth in the Notice of Exercise, TPI's right to purchase would be forfeited. See id. ¶ 15(a). Moreover, even if the balance of the purchase price tendered sixty days after the Notice of Exercise, rather than on the specified sale date, was timely, TPI would have forfeited its right to purchase because it failed to comply with the

remaining terms set forth in the Term Sheet.  See id. (providing that purchase by TPI must be at 105% of the offered purchase price and "on the terms set forth" in the Lender's Notice (such as an intercreditor agreement and "such instruments and agreements as Aetna deems necessary")).  Clearly Aetna required some documents such as a loan purchase and sale agreement.  Whether, as TPI contends, it never received Aetna's proposed draft of these documents is irrelevant.  As the purchaser it was TPI's responsibility to comply with the terms of the offer made by Algonquin which included documents deemed necessary by Aetna, which it failed to do.  Thus, even if tender of the bank check on February 17, 1997, complied with the 1996 Agreement, TPI failed to meet the other requirements to complete the purchase by that date and under subparagraph 15(b) forfeited any such right to purchase.

Any other arguments made by TPI in attempts to save its right to purchase the B Notes have been considered and are without merit.

### C. Appeal of Magistrate Judge's Order

On May 2, 2001, Hon. David E. Peebles, United States Magistrate Judge, entered an Order granting Algonquin's motion to strike TPI's jury demand.  TPI appealed.  Algonquin responded and TPI replied.

On an appeal from an order of a magistrate judge deciding a nondispositive matter, the district judge shall consider the objections made to the order and shall modify or set aside any portion of the order found to be clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a).   Magistrate Judge Peebles reasoned that the 1996 Agreement contained a waiver provision, which the parties acknowledged was valid, that applied to TPI's claims.  He thus rejected TPI's contention that the claims were not "based upon," "arising out of," or "otherwise relating to" the 1996 Agreement, the underlying loan, the loan documents, any

loan collateral, or the parties' dealings or relationships.  (See (Am. Compl. Ex. A ¶ 17.)  No portion of the order is clearly erroneous or contrary to law.  Thus, TPI's appeal will be denied.

## IV. CONCLUSION

The discovery TPI seeks with which to supplement the summary judgment record is unnecessary to a determination of the central issue.  Thus, TPI's motion to supplement the record will be denied.  TPI failed to complete the purchase of the B Note according to the requirements of the 1996 Agreement.  TPI thus forfeited its right of first refusal.  All of TPI's claims against Algonquin and Aetna with regard to the B Note are based upon a finding that TPI did not forfeit its right of first refusal (so that Aetna's subsequent sale of the B Note to Algonquin was improper).   Algonquin and Aetna are entitled to judgment as a matter of law on TPI's claims against them relating to the B Note.  TPI's cross motion for partial summary judgment will be denied.

The Magistrate Judge's Order granting Algonquin's motion to strike TPI's jury demand is not clearly erroneous or contrary to law.  Thus, TPI's appeal in this regard will be denied.

Accordingly it is

ORDERED that

1. Algonquin's motion for summary judgment is GRANTED;

2. Aetna's motion for summary judgment is GRANTED;

3. All claims of TPI as against Algonquin and Aetna with regard to the B Note are DISMISSED;

4. TPI's motion for partial summary judgment is DENIED;

5. TPI's appeal of the magistrate judge's order is DENIED; and

6. TPI's motion to supplement the summary judgment record is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated: April 12, 2006
       Utica, New York.