UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAFALGAR POWER INC. and
CHRISTINE FALLS CORPORATION,

                                          Plaintiffs,

                    vs                                      5:99-CV-1238
                                                           (Lead Case)

AETNA LIFE INSURANCE COMPANY;
ALGONQUIN POWER CORPORATION,
INC.; ALGONQUIN POWER INCOME
FUND; and ALGONQUIN POWER FUND
(CANADA) INC.;
                                          Defendants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALGONQUIN POWER CORPORATION, INC.;
ALGONQUIN POWER INCOME FUND; and
FRANKLIN INDUSTRIAL COMPLEX, INC.;

                                          Plaintiffs,

                    vs                                      5:00-CV-1246
                                                           (Member Case)

TRAFALGAR POWER, INC.; CHRISTINE
FALLS CORPORATION; and PINE RUN OF
VIRGINIA, INC.;
                                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE:
MARINA DEVELOPMENT, INC.; FRANKLIN INDUSTRIAL
COMPLEX, INC.; CHRISTINE FALLS OF NEW YORK, INC.;
TRAFALGAR POWER, INC.; PINE RUN OF VIRGINIA, INC.;

Debtors

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARINA DEVELOPMENT, INC.; TRAFALGAR
POWER, INC.; CHRISTINE FALLS OF NEW
YORK, INC.; FRANKLIN INDUSTRIAL COMPLEX,
INC.; and PINE RUN OF VIRGINIA, INC.;

Plaintiffs,

vs                                          ADV. PRO. NO. 02-80005

ALGONQUIN POWER CORPORATION, INC.;
ALGONQUIN POWER SYSTEMS, INC.; ALGONQUIN
POWER FUND (CANADA), INC.; ALGONQUIN
POWER INCOME FUND; ALGONQUIN POWER
SYSTEMS NEW HAMPSHIRE, INC.; ALGONQUIN
POWER (U.S.) HOLDINGS, INC.; AETNA LIFE
INSURANCE COMPANY; CIT CREDIT GROUP,
INC., fka NEWCOURT CREDIT GROUP, INC.;
CANADIAN INCOME PARTNERS I LIMITED
PARTNERSHIP;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

HARRIS BEACH PLLC                           PAUL J. YESAWICH, III, ESQ.
Attorneys for Trafalgar Power Parties
99 Garnsey Road
Pittsford, New York 14534

BOIS, SCHILLER & FLEXNER LLP                EDWARD J. NORMAND, ESQ.
Attorneys for Marina Development, Inc.      JASON CYRULNIK, ESQ.
333 Main Street
Armonk, New York 10504

MENTER RUDIN & TRIVELPIECE                  MITCHELL J. KATZ, ESQ.
Attorneys for Algonquin Power Parties
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1498

RACKEMANN SAWYER & BREWSTER          ALAN B. RUBENSTEIN, ESQ.
Attorneys for Algonquin Power Parties
One Financial Center
Boston, MA  02111


DAVID N. HURD
United States District Judge

### MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

After various proceedings and motion practice since this action was initiated in 1999, the following claims remain for adjudication: (1) Adversary Proceeding Cause of Action 12--Conversion; (2) Adversary Proceeding Cause of Action 14--Breach of Fiduciary Duty; (3) Adversary Proceeding Cause of Action 15--Negligent Management; (4) Adversary Counterclaim Count I--Declaratory Judgment Default under Terms of B Note Occurred; (5) Adversary Counterclaim Count III--Judgment for Amounts Due under B Note; (6) Adversary Counterclaim Count IV--Expenses of Enforcement of Pledge Agreements.

The Algonquin parties (collectively "Algonquin") move for summary judgment dismissing all remaining claims brought by Trafalgar Power, Inc. ("TPI") and Christine Falls Corporation ("CFC") (collectively "Trafalgar").  Algonquin also moves for partial summary judgment (liability) on its counterclaims.  Trafalgar opposes and cross-moves for leave to file a Second Amended and Supplemental Complaint ("proposed complaint").  Oral argument was heard on October 17, 2008, in Utica, New York.  Decision was reserved.

## II. BACKGROUND

Detailed factual background and procedural history may be found in prior decisions in this case, the engineering malpractice case, and the bankruptcy proceedings. See Trafalgar Power, Inc. v. Aetna Life Ins. Co., 427 F. Supp. 2d 202 (N.D.N.Y. Apr. 12,

2006); Trafalgar Power, Inc. v. Aetna Life Ins. Co., Nos. 99-CV-1238, 00-CV-1246, 2001 WL

640908 (N.D.N.Y. May 23, 2001); Trafalgar Power, Inc. v. Aetna Life Ins. Co., 146 F. Supp.

2d 155 (N.D.N.Y. Apr. 23, 2001) (McCurn, J.); Trafalgar Power, Inc. v. Aetna Life Ins. Co.,

131 F. Supp. 2d 341 (N.D.N.Y. Jan. 16, 2001) (Mccurn, J.) (adopting the Report

Recommendation found at Algonquin Power Corp., Inc. v. Trafalgar Power, Inc., No. 00-CV-

1246, 2000 WL 33963085 (N.D.N.Y. Nov. 8, 2000) (Peebles, M.J.)); Hydro Investors, Inc. v.

Trafalgar Power, Inc., 63 F. Supp. 2d 225 (N.D.N.Y. 1999) (denying post-trial motions), aff'd

in part, vacated & remanded in part, 227 F.3d 8 (2d Cir. 2000) (vacating denial of

prejudgment interest and remanding for calculation of such interest); see also In re Franklin

Indus. Complex, Inc., Nos. 01-67459, 01-67458, 01-67457, 2008 WL 3992233 (Bankr.

N.D.N.Y. Aug. 21, 2008); In re Franklin Indus. Complex, Inc., Nos. 01-67459, 01-67458, 01-

67457, 2008 WL 3200244 (Bankr. N.D.N.Y. Aug. 5, 2008); In re Franklin Indus. Complex,

Inc., 386 B.R. 5 (Bankr. N.D.N.Y. Apr. 8, 2008); In re Franklin Indus. Complex, Inc., 377 B.R.

32 (Bankr. N.D.N.Y. Oct. 30, 2007); In re Franklin Indus. Complex, Inc., Nos. 01-67459, 06-

80254, 01-67458, 01-67457, 2007 WL 2509709 (Bankr. N.D.N.Y. Aug. 30, 2007).  The facts

are set forth only in sufficient detail to provide context for the analysis.

       Algonquin Power Corporation, Inc. ("Algonquin Power") became manager of

hydroelectric power plants owned by Trafalgar in June 1995, pursuant to a letter agreement.

From that time forward, Algonquin held itself out as an agent of Trafalgar.  Because of a

default on its loan from Aetna Life Insurance Company ("Aetna"), Trafalgar needed to

restructure its debt.  As part of the restructuring, Aetna required that a manager be hired to

operate the plants.  To that end, Trafalgar and Algonquin Power entered into a Management

Agreement effective January 15, 1996.  The Management Agreement provided that "the

relationship . . . shall not be deemed to constitute a . . . trust or fiduciary relationship."  Under the Management Agreement, Algonquin operated and managed the power plants.  All of the income generated from the plants was deposited with State Street Bank, the Security Trustee, in an Account.  Algonquin made draw requests for its management fee and otherwise directed the Security Trustee to disburse funds from the Account to continue operations of the plants.

The debt was structured as A and B Notes and a Line of Credit, the terms of which are set forth in an Indenture Agreement.  To secure the Notes Marina Development, Inc. ("Marina"), TPI's parent company, pledged all of the stock of TPI, and TPI pledged all of the stock of CFC.

Pursuant to the Indenture Agreement, the parties were required to keep the properties free from liens and to pay taxes when due.  A default existed if the provision was not complied with and the noncompliance continued for 10 days after an executive officer was aware of the default.  In the event of a default, the Security Trustee could declare the note and all interest due and payable.

In 1997, Aetna sold the B Note to Algonquin.  Aetna subsequently sold the A Note to Algonquin.  The A Note has since been paid off.  Eventually the B Note was sold to Algonquin Power Income Fund (the "Fund"), which remains the holder of that Note.

On July 1, 1999, the IRS issued a Notice of Intent to Levy on the power projects.  The failure to pay income tax related to a combined corporate return by Trafalgar and Marina.  The loan documents permitted a combined corporate return.  On July 20, 1999, Algonquin sent Trafalgar notice of default.  Trafalgar responded denying the default.  Trafalgar states that it attempted to have Algonquin, as manager of the projects, pay the

taxes from the Account but Algonquin refused to do so.  Trafalgar further states that it also attempted to have the Security Trustee (State Street Bank) pay the taxes from the Account but that also did not occur.

On July 22, 1999, Algonquin Power, as agent for the Fund (the holder of the B Note), and Algonquin Canada, sent a Notice of Default and demanded that the taxes be paid by August 2, 1999.  There was no response and the taxes remained unpaid.

On August 5, 1999, the Fund declared a Default under the Indenture and accelerated the B Note.  This prompted Trafalgar to file the Lead Case, No. 99-CV-1238, on August 9, 1999, challenging the legality of the Aetna's sales of the Notes to Algonquin. Aetna's sale of the B Note to Algonquin Power was upheld in prior proceedings.  See 427 F. Supp. 2d at 212.

On August 20, 1999, the IRS issued a Notice of Levy.  On September 9, 1999, Algonquin Power, again as agent for the Fund and Algonquin Canada, requested that the Security Trustee take possession of TPI and CFC stock pursuant to the Pledges.  Algonquin subsequently directed the Security Trustee to pay the IRS Lien out of funds in the Account.

On May 23, 2001, District Judge Neal P. McCurn entered a Memorandum-Decision and Order granting Algonquin's motion to compel arbitration and stay litigation of Claim 7 (conversion) in the Lead Case.  Accordingly, Claim 7 was severed from the action.

On June 21, 2001, Magistrate Judge David Peebles entered a Memorandum-Decision and Order that, among other things, denied Trafalgar's motion to amend the complaint to assert a conversion cause of action.  Judge Peebles reasoned that it would be futile to assert a conversion cause of action because it would not survive a Rule 12(b)(6) motion to dismiss.  However, Judge Peebles specifically permitted Trafalgar to engage in

additional discovery and again seek to amend to conceivably state causes of action including conversion.  Accordingly, the deadline for amendment of pleadings was extended to September 1, 2001.

TPI and CFC filed for bankruptcy protection on August 27, 2001, in North Carolina.  The bankruptcy case was transferred to the Northern District of New York in December 2001.  Trafalgar filed an adversary proceeding on August 28, 2001, the reference of which was withdrawn as to the remaining claims as set forth above.  The claims in the adversary proceeding for which the reference was withdrawn were consolidated with the Lead Case.  The adversary complaint cause of action 12 is virtually identical to the original conversion count 7 in the Lead Case and the conversion claim in the proposed amended pleading that Judge Peebles denied permission to file.

## III.  STANDARDS

### A.  Summary Judgment

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.  Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

## B.  Amend and Supplement Complaint

Leave to amend a complaint should be freely given.  Fed. R. Civ. P. 15(a). Supplementation may be permitted "upon such terms as are just" to set "forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  Fed. R. Civ. P. 15(d).

In a case where there is a scheduling order in place, giving leave to amend freely "must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'"  Grochowski v. Phoenix Constr., 318 F.3d 80, 87 (2d Cir. 2003) (quoting Fed. R. Civ. P. 16(b)); Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).  "A finding of good cause depends on the diligence of the moving party."  Grochowski, 318 F.3d at 87; Parker, 204 F.3d at 340.  Once a finding of good cause has been made, the district court exercises its discretion in determining whether or not to permit leave to appeal.  Zomba Recording Corp.

v. MP3.Com, Inc., Nos. 00 CIV. 6831, 00 CIV. 6833, 2001 WL 770926, at *1 (S.D.N.Y. July 10, 2001).

Several factors may be considered when determining whether to permit an amendment.  Nerney v. Valente & Sons Repair Shop, 66 F.3d 25, 28 (2d Cir. 1995); Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234, 235 (2d Cir. 1995).  Normally in the absence of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment'" leave to amend should be granted.  Rachman, 46 F.3d at 234 (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962)).

## IV.  DISCUSSION

As set forth above, Algonquin moves for summary judgment dismissing the plaintiff's claims and for partial summary judgment on its counterclaims, and Trafalgar cross-moves for leave to file the proposed complaint.  Because an amended complaint could effect the summary judgment motion it is addressed first.

### A.  Motion to Amend

An amended scheduling order was entered on July 18, 2001, setting, inter alia, a deadline of September 1, 2001, for amendment of the pleadings.  Multiple amendments were subsequently made to certain deadlines in the scheduling order, several of which indicated no further extensions would be granted.  Additionally, a Decision and Order dated January 24, 2008, which extended the fact discovery deadline until March 31, 2008, noted that no other deadlines would be affected by this extension.  Despite the indications that the scheduling order changes would be final, additional extensions were granted.  The latest

scheduling order change, entered on October 22, 2008, was an extension of the time to complete expert witness depositions to December 12, 2008.

Causes of action 1, 2, and 3 in the proposed complaint mirror the causes of action remaining from the Adversary Complaint (conversion, breach of fiduciary duty, and negligence).  According to Trafalgar, it fills out the factual allegations of the remaining causes of action regarding the scope of Algonquin's alleged misconduct and quantifies damages, as well as adding facts uncovered in discovery that show Algonquin's alleged "continuing, grave misconduct" since the amended complaint was filed on January 11, 2000.

Given the protracted proceedings in this action, including numerous extensions of various deadlines in scheduling orders, some of which were given despite warnings that no additional extensions would be granted, Trafalgar's lack of diligence (as argued by Algonquin) in seeking to amend the complaint should not be an impediment to a finding of good cause.  The new claims asserted in the proposed complaint will be discussed seriatim.

**1.  Conversion Claim**

On June 21, 2001, Judge Peebles found the conversion claim as set forth in that proposed amended complaint failed to state a claim.  Permission was granted to replead; however, Trafalgar did not do so.  Instead, Trafalgar filed an Adversary Complaint on August 28, 2001, with essentially the same conversion claim that had been found lacking in the June 21, 2001, Order.  Trafalgar's failure to cure the deficiencies in the asserted conversion claim despite the court's invitation to do so is sufficiently dilatory to warrant denial of the motion to amend this claim.

## 2.  Breach of Implied Covenant of Good Faith and Fair Dealing

In this claim it is alleged that Algonquin had obligations under the Management Agreement but it used it's authority for its own personal gain and denied Trafalgar the fruits of the Agreement.  Although "an implied covenant of good faith and fair dealing" is recognized in all contracts, the covenant "is not distinct from the underlying contract."  Alter v. Bogoricin, No. 97 CIV. 0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997).  Accordingly an action for breach of the covenant of good faith and fair dealing is duplicative of a breach of contract claim.  Here the parties acknowledged at oral argument that no breach of contract claim was brought because any such claim would be subject to arbitration pursuant to the parties' contract.  Additionally, any authority Algonquin used it had because of the Management Agreement.  Thus, any alleged misuse of that authority would be a breach of contract. Recognition of a claim for breach of implied covenant of good faith and fair dealing separate and apart from a claim for breach of contract would allow Trafalgar to evade the arbitration clause in the Management Agreement.  Accordingly, allowance of an amendment to assert a claim for breach of implied covenant of good faith and fair dealing would be futile.

## 3.  Negligent Performance of a Contract for Services

This claim asserts that the Management Agreement imposed a duty upon Algonquin to exercise reasonable care and skill in managing the power plants.  No negligence claim will lie where the conduct at issue is a breach of contract, unless the allegation is that "a legal duty independent of the contract has been violated."  Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (N.Y. 1987).  In other words, "new York does not recognize a cause of action for negligent performance of a contract."  Chase Manhattan Bank, N.A. v. Remington Prods., Inc., 865 F. Supp. 194, 200 (S.D.N.Y. 1994)

(citing Clark-Fitzpatrick, Inc., 70 N.Y.2d at 389), aff'd, 71 F.3d 407 (2d Cir. 1995) (Table).

According to the allegation of this cause of action it is based upon the Management

Agreement.  Thus, the appropriate claim is a breach of contract claim, not negligence.

Amendment to assert a negligence claim would be futile.

   Trafalgar contends that there is an exception to the rule barring tort claims for

breach of contract where the allegation is negligent performance of a service contract.  This

argument fails because the authority cited for this proposition is inapposite.  See William

Wrigley Jr. Co. v. Waters, 890 F.2d 594, 602-03 (2d Cir. 1989) (finding duty of due care

outside the contract was imposed by law when defendants held themselves out as experts in

trademark law); Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co., No. 05 Civ. 217,

2008 WL 190310, at *17, 20-21 (S.D.N.Y. Jan. 16, 2008) (finding allegation of breach of duty

of due professional care by architect in performing contract could be sued as breach of

contract or tort claim; finding no duty independent of the contract for co-prime contractors

therefore dismissing tort claims); Inter Impex S.A.E. v. Comtrade Corp., No. 00 Civ. 0133,

2004 WL 2793213, at *6 (S.D.N.Y. Dec. 6, 2004) (dismissing negligence claim where plaintiff

failed to allege breach of an "independent duty other than that emanating from the asserted

contractual relationship"); Consol. Edison Co. v. Westinghouse Elec. Corp., 567 F. Supp.

358, 364-66 (S.D.N.Y. 1983) (finding that plaintiff stated a claim for negligent performance of

a contract for services while dismissing the negligence claim related to defective equipment);

see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 725 F. Supp. 656,

662, 665 (N.D.N.Y. 1989) (explaining that contrary to the broad rule stated in Consol. Edison

Co., 567 F. Supp. at 364, that New York recognized a tort cause of action for performance of

contractual services, the general rule is that a duty must be "distinct from, or in addition to, the breach of a contract" in order for a tort cause of action to lie).

Trafalgar also argues that where the nature of the services affects a significant public interest a negligence in performance of services under a contract claim will lie. Trafalgar argues that the significant public interest at issue here is the reliable and safe generation of electricity.  Again, the authority cited by Trafalgar is inapposite.  See Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 548 (N.Y. 1992).  In Sommer, plaintiff alleged gross negligence in failure to perform a service for which it had contracted, specifically, providing regulated central station fire services that included transmitting alarm signals.  Id. at 550. The court found that the nature of the fire alarm services provided by the defendant, and the consequent catastrophic nature of a failure to perform such services gave rise to a duty of care independent of the contract.  Id. at 552-553.  Here, Trafalgar alleges that Algonquin negligently performed the management and operation of the power plants, a service that is within the Management Agreement.  No independent duty outside of Algonquin's contractual duties arose.

### 4. Breach of Contract

Trafalgar alleges that Algonquin breached the June 14, 1995, letter agreement in which Algonquin agreed not to enter any agreement with Aetna regarding financing of Trafalgar projects without the approval of Trafalgar.  The alleged breach--Algonquin making an agreement with Aetna about financing of the power plants without Trafalgar pre-approval-- occurred in 1997.  The statute of limitations on contract claims is six years from the time of the breach.  N.Y. C.P.L.R. 213(2) (McKinney Supp. 2008).  The statute started to run when the alleged breach occurred in 1997.  Thus, it expired in 2003.  A breach of contract claim

therefore is time-barred and amendment of the complaint to add this cause of action would be futile.

Trafalgar argues that the breach of the June 14, 1995, letter agreement relates back to the original complaint.  Under Fed. R. Civ. P. 15(c), a claim relates back if it "'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'"  Rosenberg v. Martin, 478 F.2d 520, 526 (2d Cir. 1973) (quoting Fed. R. Civ. P. 15(c)).  Here the original complaint set forth claims arising from the restructured debt and Management Agreement that was effective January 16, 1996.  The proposed breach of contract action arises from the alleged breach of a June 14, 1995, agreement.  The proposed claim did not arise out of the conduct, transaction, or occurrence set forth in the original pleading.  Trafalgar contends that Algonquin was on notice that it was managing and operating the power plants since 1995 and subsequently acquired the Notes created during the debt restructuring.  While this may be true, it does not follow Algonquin was somehow put on notice that its activities prior to the 1996 Management Agreement were at issue in this litigation.  Similarly, Algonquin's failure to produce the letter agreement in discovery does not lead to the conclusion that Trafalgar reasonably failed to identify the document at the time of the original complaint, thus excusing its failure to specify claims arising from it.  This is particularly true since Trafalgar was certainly aware that Algonquin managed and operated its power plants beginning in June 1995 and Trafalgar had the letter agreement in its control.  Thus, Trafalgar's arguments do not save the breach of contract claim from futility.

### 5.  Civil RICO Violations

Trafalgar's five proposed RICO causes of action allege a pattern of fraud and deceit by Algonquin Power and the Fund, in cooperation with the other Algonquin entities, for

over ten years, that, according to Trafalgar, amounts to a pattern of racketeering activity. Among the predicate acts alleged are mail fraud, wire fraud, financial institution fraud, deprivation of the intangible right of honest services, tampering with evidence, and fraud in connection with a Title 11 (bankruptcy) case.  The factual allegations relating to the RICO claims are essentially the same as provide the basis for all the other claims; that is, Algonquin mismanaged the power plants, appropriated Trafalgar's funds for its own use, improperly obtained the Notes, and breached its duties under the Management Agreement.

In order to meet the threshold pleading requirements of a RICO action, a plaintiff must allege the following:   "(1) [T]hat the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)).

To establish a pattern of racketeering activity, a plaintiff must plead at least two predicate acts occurring within ten years, see § 1961(5), and must show that the acts "are related, and that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 2900 (1989); see also GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir. 1995).  The alleged predicate acts "must be among the various criminal offenses listed in § 1961(1)."  Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008).  Predicate acts are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  H.J. Inc., 492 U.S. at 240, 109 S. Ct. at 2901.  Moreover, the

predicate acts must extend over a substantial period of time establishing a "closed-ended" pattern, or pose a threat of extending "beyond the period during which the predicate acts were performed" establishing an "open-ended" pattern of related acts.  Spool, 520 F.3d at 183 (citing H.J. Inc., 492 U.S. at 241, 109 S. Ct. at 2901).

With respect to the fifth element necessary to adequately plead a RICO violation, under § 1962(a), mere participation in the predicate acts of racketeering is insufficient to establish a RICO violation.  Ouaknine v. MacFarlane, 897 F.2d 75, 82 (2d Cir. 1990).  Rather, a plaintiff must allege injury as a result of the defendants' "investment of racketeering income in an enterprise."  Id.  Similarly, to establish a violation of § 1962(b), a plaintiff may not merely allege injury from the defendant's commission of the predicate acts, but must allege injury resulting "from the defendant's acquisition or control of an interest in a RICO enterprise . . . ."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1190 (3d Cir. 1993); see also Morin v. Trupin, 835 F. Supp. 126, 133 (S.D.N.Y. 1993) (stating that "Courts interpreting Section 1962(b) draw a distinction between the predicate acts and the acquisition or maintenance of an interest in a RICO enterprise.").  Finally, to state a claim under § 1962(c), a plaintiff must allege that the defendants actively participated in or exercised some degree of direction over a RICO enterprise's affairs.  See Reves v. Ernst & Young, 507 U.S. 170, 183, 113 S. Ct. 1163, 1172 (1993).  Mere allegations that a corporate defendant failed to adequately supervise the person who effectuated a pattern of racketeering activity does not satisfy the active participation requirement.  See Cruse v. Equitable Sec. of New York, Inc., 678 F. Supp. 1023, 1034 (S.D.N.Y. 1987).

The elements of an action based on mail or wire fraud are "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and

(3) the use of interstate mails or transmission facilities in furtherance of the scheme."

S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996); see 19

U.S.C. §§ 1962 (a)-(d).  The first RICO element requires the existence of fraud and a

misrepresentation that is material to the harm of the victim.  Moore v. PaineWebber, Inc., 189

F.3d 165, 170 (2d Cir. 1999).  Fraud must be plead with particularity, and "must allege facts

that give rise to a strong inference of fraudulent intent."  S.Q.K.F.C., Inc., 84 F.3d at 634.  A

strong inference of fraudulent intent can be plead "by (1) alleging facts to show that

defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Id.

Mail or wire fraud involving honest services involves "a scheme or artifice to use

the mails or wires to enable an officer or employee of a private entity . . . purporting to act for

and in the interests of" the employer "secretly to act in his or her or the defendant's own

interests instead, accompanied by a material misrepresentation made or omission of

information disclosed to the employer."   U.S. v. Gotti, 459 F.3d 296, 330 (2d Cir. 2006).

There are two general groups of honest services cases: those "involving bribes or kickbacks,

and cases involving self-dealing."  U.S. Rybicki, 354 F.3d 124, 139 (2d Cir. 2003).  In the

self-dealing cases, the defendant typically causes his or her employer to do business with a

corporation or other enterprise in which the defendant has a secret interest, undisclosed to

the employer."  Id. at 140.

Defendant argues that there was undue delay which would, if leave to amend is

granted, cause it undue prejudice.  Trafalgar argues that its delay was not undue because

facts uncovered in discovery revealed its RICO allegations.  However, Trafalgar, in the

course of arguing that the RICO claims "relate back," admits that these claims are based in

- 17 -

the same "conduct, transactions and occurrences set forth in prior complaints."  (Pl.'s Reply Mem. at 19, Doc. No. 301.)  Moreover, Trafalgar's "most recent allegations" include, for example, diversion of the opportunity to acquire the Notes, creating a default under the Indenture Agreement by failing to pay the taxes from the Account, and failing to operate and manage the power plants properly.  The Adversary Complaint was filed on August 29, 2001, containing the same allegations upon which the RICO claims are based.  Although detail regarding the amounts of damages have been added, the underlying alleged misconduct remains the same.  Thus, the facts upon which it could have filed RICO causes of action were known to Trafalgar at least as early as 2001, some seven years ago.

Additionally, as the above somewhat brief recitation of the law surrounding RICO claims demonstrates, RICO causes of action are complex, multi-layered claims.  It is not unlikely that Algonquin would require some additional fact discovery in order to defend against the RICO claims.  Trafalgar seeks to add these claims after fact discovery has been closed and after summary judgment motions were made, the rulings upon which will dispose of claims or render them trial ready.  Given the circumstances as set forth, Trafalgar has unduly delayed in seeking to amend its complaint to add RICO causes of action.  Cf. American Medical Ass'n v. United Healthcare Corp., No. 00 Civ. 2800, 2006 WL 3833440, at *4-5 (S.D.N.Y. Dec. 29, 2006) (collecting and distinguishing cases where motions for leave to amend were denied; declining to deny leave to amend based upon undue delay where discovery was in early stages, no scheduling order or deadline for filing motions had expired, and case was not nearly trial ready).

Further, permitting the addition of RICO claims would require Algonquin to expend additional resources to conduct additional motion practice and prepare for trial, even

if additional discovery were not required.  If Trafalgar is permitted to bring RICO claims at this late date, disposition of the claims, whether by motion or trial, will be delayed.  Accordingly, the delay in Trafalgar seeking to add RICO claims to this action would cause undue prejudice to Algonquin.  See id. at *6.  Based upon the foregoing, Trafalgar's motion to amend the complaint to add RICO claims will be denied due to undue delay in bringing such claims and undue prejudice to Algonquin that would result from permitting the amendment.

### 7. Unjust Enrichment

Trafalgar seeks to add an unjust enrichment claim to capture all the alleged misconduct of Algonquin to "unjustly benefit themselves at the expense of" Trafalgar.  A claim for unjust enrichment "only applies in the absence of an express agreement."  Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388.  Here there was an express written agreement--the Management Agreement.  Accordingly, a claim for unjust enrichment will not lie and amending the complaint to assert such a claim would be futile.

Trafalgar argues that claims for breach of contract and quasi contract are not mutually exclusive, citing Joseph Sternberg, Inc. v. Walber 36th St. Assocs., 187 A.D.2d 225, 227-28 (N.Y. App. Div. 1st Dep't 1993).  However, as that court went on to state, the possibility of recovery in quasi contract applies only "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue," which is not the circumstance here.  See id. at 228.  Moreover, the Joseph Sternberg, Inc. Court contemplated submission of both contract and quasi contract theories to the jury as alternative bases for recovery--here there is no contract cause of action.  See id.  Again, "plaintiffs cannot recover for unjust enrichment while simultaneously alleging the existence of

an express contract covering the same subject matter."  MJM Adver., Inc. v. Panasonic Indus. Co., 294 A.D.2d 265, 266 (N.Y. App. Div. 1st Dep't 2002).

### B. Summary Judgment Motion

Algonquin states that the relief it seeks on this motion is as follows: (1) dismissal of all remaining claims against the Algonquin entities; (2) regarding the Fund's counterclaims, issuance of a declaration that TPI and CFC did default under the terms of the A and B Notes and the applicable loan documents [that is, that Trafalgar defaulted and the Security Trustee, on behalf of the Fund, has the right to take possession of the collateral (stock , making the Fund the owner of the power plants)]; (3) set a hearing to determine amounts due under the B Note; (4) set a hearing to determine the amounts due from TPI, CFC, and Marina for costs and expenses; and (5) issuance of declaration that the Fund is the rightful holder of the stock of TPI and CFC under the Pledge Agreements.  As to the fifth relief sought, in response to Trafalgar's opposition, the Fund concedes that the appropriate relief on this cause of action would be an issuance of an order finding that Algonquin holds a valid pledge of the stock and directing the Security Trustee to hold a private or public sale of the stock as provided by the Pledge Agreement.

### 1. Conversion--Twelfth Adversary Cause of Action

As discussed with relation to the motion to amend, on June 21, 2001, Judge Peebles found the proposed conversion claim in the lead case failed to state a claim. Although he permitted Trafalgar to replead in an attempt state a claim, Trafalgar failed to do so.  Rather, Trafalgar filed essentially the same conversion claim in the twelfth cause of action in the Adversary Proceeding.  The deficiencies noted by Judge Peebles were not cured.  Accordingly, the conversion cause of action will be dismissed.

### 2.  Breach of Fiduciary Duty--Fourteenth Adversary Cause of Action

An express disclaimer of a duty in a contract precludes a suit upon that duty.

Cooper v. Parsky, 140 F.3d 433, 439 (2d Cir. 1998); Valjean Mfg. Inc. v. Michael Werdiger,

Inc., No. 03 Civ. 6185, 2004 WL 1948752, at * 4 (S.D.N.Y. Sept. 2, 2004).  Here Section 2.1

of the Management Agreement disclaims the creation of any fiduciary relationship, as

follows:

> Operator shall perform and execute the provisions of this
> Agreement as an independent contractor and shall not be an
> agent or employee of Owner without limiting the foregoing, the
> relationship between Operator [Algonquin] and Owner [Trafalgar]
> (or any successor or assignee of Owner) hereunder shall not be
> deemed to constitute a partnership, joint venture, or trust or
> fiduciary relationship, or any other similar relationship.

(Algonquin's 7.1 Statement Ex. H at T-000090, Doc. No. 268-13 (emphasis added).)

Algonquin and Trafalgar have expressly disclaimed any fiduciary relationship.  Thus,

Algonquin owed no fiduciary duty to Trafalgar and the fourteenth adversary cause of action

must be dismissed.

### 3.  Negligent Operation and Management of the Facilities--Fifteenth Adversary Cause of Action

The analysis set forth in the section regarding amendment to assert a

negligence claim likewise applies here.  In sum, there was no duty independent of the

contract, the harm alleged was purely economic, and the contract did not have a significant

impact on the public interest.  The negligence cause of action will be dismissed.

### C.  Partial Summary Judgment on Counterclaims

Algonquin contends that it is entitled to a declaration that a default occurred

when the Internal Revenue Service issued a Notice of Intent to Levy and Trafalgar failed to

cure the lien.  It further argues that as a result of the default, it has the right to take

possession of the collateral under the Pledge Agreements.  The Indenture Agreement

provided that if either party failed to comply with any provision, continuing for ten days, an

"event of default" would have occurred.  Specifically, the Indenture Agreement states

> An event of default (an "Event of Default") shall exist if any of the
> following occurs and is continuing: . . . (b) <u>Other Defaults.</u>  Either
> Company shall fail to comply with any other provision of this
> Indenture or any provision of any other Financing Document, and
> such failure continues for more than ten (10) days after such
> failure shall first become known to any executive officer of either
> Company.

<u>Id</u>. Ex. E at 37, Doc. No. 268-10.  The Indenture Agreement also provides that "[t]he

Companies shall keep the Indenture Estate free from all Liens . . . and . . . shall pay and

discharge, when due, all taxes . . . ."  <u>Id</u>. at 19.   "Companies" refers to TPI and CFC

collectively.  <u>Id</u>. at 1.  From these provisions Algonquin gleans that Trafalgar, by failing to pay

the IRS taxes when due (as evidenced by the Notice of Intent to Levy), created an event of

default which continued for more than ten days after it notified TPI of the default, entitling it to

immediate payment of the full amount due under the Notes and to take possession of the

collateral should such payment not be made.

　　　　　The Indenture Agreement also provides that Trafalgar submit to the Security

Trustee for payment "taxes, assessments and governmental charges imposed upon the

Companies or their respective Properties or other claims which, if unpaid, might result in the

creation of a Lien upon any of such Properties."  <u>Id</u>. at 30.  It also authorizes the Security

Trustee to disburse monies for payment of operational expenses.  <u>Id</u>. at 30-32.

　　　　　In the event of a default, the Indenture Agreement provides that the debt holder

make a written request to the Security Trustee which then may provide Trafalgar written

notice that all outstanding amounts due on the Notes are immediately due and payable.[1] Id. at 36-37.  In the event that Trafalgar should default on that payment, the Indenture Agreement permits the Security Trustee to exercise all potential remedies, including foreclosure and taking possession of all of the Indenture Estate.[2] Id. at 38-39.

In this case, Algonquin notified Trafalgar of the Notice of Intent to Levy and what it considered to be an event of default.  Algonquin did not make a written request to the Security Trustee.  Trafalgar notified the Security Trustee as soon as it became aware of the Notice of Intent to Levy.  It requested that the taxes be paid as an operational expense of the power plants.  The Security Trustee refused to pay the tax to avoid the tax lien.  Algonquin did not request that the Security Trustee notify Trafalgar of the default, and did not make a written request to the Security Trustee seeking acceleration of the full amount due on the Notes.  Hence, the Security Trustee did not provide written notice to Trafalgar that the indebtedness on the Notes was accelerated.  Moreover, the Security Trustee has not exercised the remedies set forth in the Indenture Agreement.  Rather, Algonquin has unilaterally declared that Trafalgar defaulted on the Note, it now owns all of the stock of Trafalgar pursuant to the Pledge Agreements, and by virtue of owning all of the stock it now owns the power plants.  In the meantime, Algonquin caused the Security Trustee to pay the taxes.

---

[1]  The Indenture Agreement further provides that "the Security Trustee shall give to the Companies and each holder of Notes written notice of each and every Event of Default of which it shall become aware within ten (10) days of becoming aware thereof." Id. at 57.

It also provides that in the event of a default relating to payments made on the Notes, a holder of Notes which has not consented to a waiver of the default may accelerate the debt. Id. at 37.  This provision is inapplicable here.

[2]  See generally id. at 38-46, for additional remedies and enforcement rights.

None of the provisions in the Indenture Agreement pertaining to the prescribed course of events should a default occur have been followed.  Further, the event of default--nonpayment of taxes--has been cured by the payment of the taxes.  Algonquin's position cannot be rehabilitated given its and the Security Trustee's failures to follow the appropriate procedures set forth in the Indenture Agreement coupled with the subsequent eradication of the alleged event of default.  Thus, Algonquin's counterclaim seeking a declaration that Trafalgar defaulted under the terms of the Note must be dismissed.  Its remaining counterclaims are based upon it prevailing as to the counterclaim seeking a declaration of default and are therefore moot.

## V. <u>CONCLUSION</u>

Given the protracted proceedings up to this point in the litigation, Trafalgar's motion to amend will not be denied for lack of good cause.  However, Trafalgar had the opportunity to cure the failure to state a conversion claim but did not do so; therefore, the motion to amend as to conversion will be denied for dilatory conduct.  Amendment to add breach of implied covenant of good faith and fair dealing and negligent performance of a contract for services claims would be futile because a written contract exists.  The breach of the June 14, 1995, letter agreement contract is time-barred and is not saved by relation back.  Amendment to add civil RICO claims will be denied because Trafalgar's undue delay in asserting these claims would cause undue prejudice to Algonquin.  Amendment to add an unjust enrichment claim would be futile, as such a claim will not lie where a contract covering the matter at issue exists.

Trafalgar's conversion claim must be dismissed because the deficiencies previously noted by Judge Peebles have not been cured--the adversary complaint fails to

state a conversion cause of action.  The express disclaimer in the Management Agreement precludes the breach of fiduciary claim, and it must be dismissed.  In light of the written agreement between the parties, the negligent management claim must be dismissed.

Even if there was an event of default under the Management Agreement, none of the appropriate provisions in such event were followed.  Then, the default was cured by payment of the taxes.  Algonquin's counterclaim for a declaration of default under the B Note, as well as the other counterclaims based upon the default, must be dismissed.

Accordingly it is

ORDERED that

1.  Trafalgar's motion to amend the complaint is DENIED;

2.  Algonquin's motion for summary judgment is GRANTED;

3.  Algonquin's motion for partial summary judgment on its counterclaims is DENIED;

4.  All of the remaining claims brought by Trafalgar are DISMISSED;

5.  All of Algonquin's counterclaims are DISMISSED; and

6.  The action is DISMISSED in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   November 6, 2008
            Utica, New York.