UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAFALGAR POWER INC. and
CHRISTINE FALLS CORPORATION,

                        Plaintiffs,

        vs                                  5:99-CV-1238
                                           (Lead Case)

AETNA LIFE INSURANCE COMPANY;
ALGONQUIN POWER CORPORATION,
INC.; ALGONQUIN POWER INCOME
FUND; and ALGONQUIN POWER FUND
(CANADA) INC.;

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALGONQUIN POWER CORPORATION, INC.;
ALGONQUIN POWER INCOME FUND; and
FRANKLIN INDUSTRIAL COMPLEX, INC.;

                         Plaintiffs,

        vs                                  5:00-CV-1246
                                       (Member Case)

TRAFALGAR POWER, INC.; CHRISTINE
FALLS CORPORATION; and PINE RUN OF
VIRGINIA, INC.;

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE:
MARINA DEVELOPMENT, INC.; FRANKLIN INDUSTRIAL
COMPLEX, INC.; CHRISTINE FALLS OF NEW YORK, INC.;
TRAFALGAR POWER, INC.; PINE RUN OF VIRGINIA, INC.;

Debtors

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARINA DEVELOPMENT, INC.; TRAFALGAR
POWER, INC.; CHRISTINE FALLS OF NEW
YORK, INC.; FRANKLIN INDUSTRIAL COMPLEX,
INC.; and PINE RUN OF VIRGINIA, INC.;

Plaintiffs,

vs                                                        ADV. PRO. NO. 02-80005

ALGONQUIN POWER CORPORATION, INC.;
ALGONQUIN POWER SYSTEMS, INC.; ALGONQUIN
POWER FUND (CANADA), INC.; ALGONQUIN
POWER INCOME FUND; ALGONQUIN POWER
SYSTEMS NEW HAMPSHIRE, INC.; ALGONQUIN
POWER (U.S.) HOLDINGS, INC.; AETNA LIFE
INSURANCE COMPANY; CIT CREDIT GROUP,
INC., fka NEWCOURT CREDIT GROUP, INC.;
CANADIAN INCOME PARTNERS I LIMITED
PARTNERSHIP;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

HARRIS BEACH PLLC                           JOSEPH D. PICCIOTTI, ESQ.
Attorneys for Trafalgar Power Parties       PAUL J. YESAWICH, III, ESQ.
99 Garnsey Road                             LAURA W. SMALLEY, ESQ
Pittsford, New York 14534                   WENDY A. KINSELLA, ESQ.

NIXON PEABODY, LLP                          ROBERT B. CALIHAN, ESQ.
Attorneys for Aetna Life Ins. Co.           ANDREW M. BURNS, ESQ.
P.O. Box 1051
Rochester, New York 14603

MENTER RUDIN & TRIVELPIECE                     MITCHELL J. KATZ, ESQ.
Attorneys for Algonquin Power Parties          JEFFREY A. DOVE, ESQ.
308 Maltbie Street, Suite 200
Syracuse, New York 13204

RACKEMANN SAWYER & BREWSTER                     J. DAVID LESLIE, ESQ.
Attorneys for Algonquin Power Parties          ERIC A. SMITH, ESQ.
One Financial Center                           BRIAN M. HURLEY, ESQ.
Boston, MA  02111

BOND SCHOENECK & KING                          CAMILLE WOLNIK HILL, ESQ.
Attorneys for Franklin Industrial Complex, Inc.  STEPHEN A. DONATO, ESQ
One Lincoln Center
Syracuse, NY 13202

HANCOCK & ESTABROOK, LLP                        DANIEL B. BERMAN, ESQ.
Attorneys for Marina Development Parties (Debtors)
1500 MONY Tower I
P.O. Box 4976
Syracuse, New York 13221


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On November 18, 2010, the United States Court of Appeals for the Second Circuit

issued an amended summary order affirming in part and vacating and remanding in part

orders dated April 12, 2006, December 19, 2006, and November 6, 2008. Christine Falls

Corp. v. Algonquin Power Fund, Inc., 401 Fed. Appx. 584, 587 (2d Cir. 2010) (unpublished

summary order).  A Mandate was issued on January 21, 2011, and filed in the Northern

District of New York on February 1, 2011.

As directed, defendants Algonquin Power Corporation, Inc. ("Algonquin Power"),

Algonquin Power Income Fund ("the Fund"), and Algonquin Power Fund (Canada) Inc.

(collectively "Algonquin") filed a brief in support of their motion for summary judgment on their counterclaims. Plaintiffs Trafalgar Power, Inc. ("TPI") and Christine Falls of New York, Inc. ("CFC") (collectively "Trafalgar") filed a brief in opposition. Algonquin filed a reply. The matter was taken on submission without oral argument.

## II. BACKGROUND

As the Second Circuit stated, this matter arose "from a complex web of litigation stemming from a loan agreement initially entered into between [Trafalgar and Aetna Life Insurance Company ('Aetna')], and Aetna's subsequent sale of the debt instruments that agreement created—an "A" and a "B" note—to [Algonquin]." Id. at 586. The background of this "complex web of litigation" is set forth in the various decisions pertaining to these consolidated cases as well as the underlying engineering malpractice case and the bankruptcy proceedings. See, e.g., Trafalgar Power, Inc. v. Aetna Life Ins. Co., 396 B.R. 584, 586-87 (N.D.N.Y. 2008) (collecting cases), affirmed in part, vacated & remanded in part, 401 Fed. Appx. 584. Familiarity with the background set forth in the prior decisions is assumed.

The following facts are undisputed. Trafalgar obtained a loan from Aetna Life Insurance Company ("Aetna") to finance its development of hydroelectric power plants in upstate New York. Trafalgar's default on its loan from Aetna led to a restructuring of the debt—with Trafalgar issuing A and B Notes which Aetna purchased for $22.5 million. As a precondition to the debt restructuring, Aetna required that Trafalgar hire a manager for the power plants. Algonquin Power became that manager. State Street Bank ("Security Trustee") was named trustee of the security for the loan, including the income generated by the power plants. Various documents were executed by the parties in conjunction with the

- 4 -

restructured debt as will be set forth in more detail in the analysis below.  In addition to pledging virtually all of its rights and properties as collateral for the restructured loan, all of the stock of TPI and CFC was pledged as security.[1]

The loan documents provided, among other things, that the properties would be kept free from liens and the taxes would be paid when due.  An Event of Default would arise from violation of any terms which continued for ten days.  If an Event of Default existed, the notes could be accelerated.  Various other remedies for default were set forth in the loan documents.

Aetna sold the A and B Notes to Algonquin in 1997.  The A note has been paid.  The Fund is the current holder of the B Note.

Trafalgar filed its corporate income tax returns as part of a Marina filing group. Trafalgar filed tax returns for the 1996 and 1997 tax years that reflected an amount due. However, Trafalgar failed to pay the amounts due.  The Internal Revenue Service ("IRS") attempted to collect the overdue taxes and penalties from Trafalgar to no avail.  Eventually, on July 1, 1999, the IRS issued a Notice of Intent to Levy on the power projects.  Algonquin notified Trafalgar that it was in default due to its failure to pay its corporate income taxes, demanding that the taxes be paid by August 2, 1999.  Trafalgar did not pay the taxes.  On August 5, 1999, Algonquin notified Trafalgar that an Event of Default existed under the loan documents and that the B Note was being accelerated.  Trafalgar filed the complaint in this action on August 9, 1999.

---

[1]  Marina Development, Inc. ("Marina") owned 100% of the stock of TPI.  TPI owned 100% of the stock of CFC.  Marina pledged its TPI stock and TPI pledged its CFC stock, resulting in all of TPI and CFC stock being pledged as security for the restructured loan.

When the IRS issued a Notice of Levy on August 20, 1999, Algonquin directed the Security Trustee to pay the IRS.  Algonquin also directed the Security Trustee to take possession of all funds on deposit and remit those funds to Algonquin.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.  Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

## IV.  DISCUSSION

Algonquin's counterclaims "seek a declaratory judgment that Trafalgar defaulted with respect to both the A and B Notes[2] and, accordingly, that Algonquin was entitled to accelerate the balances dues."  401 Fed. Appx. at 589.  The Second Circuit vacated dismissal of the counterclaims brought by Algonquin.[3]  Id. at 587.  It directed that a determination be made "whether (1) an event of default occurred within the meaning of the parties' various agreements, and (2) if so, whether Algonquin properly exercised its rights as the Note holder pursuant to those agreements."  Id. at 589.[4]  Once that determination is made, "the question of whether summary judgment is appropriate" can be resolved.  Id. at 590.

### A.  Event of Default

The Indenture defines an Event of Default as when Trafalgar failed to comply with any provision of the Indenture or any other financing document and the failure continued for more

---

[2]  The A Notes have been paid off.  Therefore, only the B Notes are at issue.

[3]  Trafalgar argues that certain conclusions underlying the November 6, 2008, Memorandum-Decision and Order constitute "law of the case" and must still apply.  However, those underlying conclusions were not, as Trafalgar asserts, "holdings."  Moreover, because that decision, dismissing the counterclaims, was vacated, those conclusions no longer apply.  As Algonquin stated:  "no amount of the careful use of ellipses or quotation marks can change the word "VACATED" to "AFFIRMED."  Def.'s Reply Mem. at 18.

Trafalgar contends that the conclusions that the required notice of Event of Default was not issued, and the Event of Default was cured, still stand.  However, the Second Circuit specifically directed that it must be determined whether an Event of Default occurred, and, if so, whether as Note holder Algonquin "properly exercised its rights."  401 Fed. Appx. at 589.  Exercise of rights as Note holder encompasses issuance of notice of an Event of Default as well as payment to the IRS to discharge the lien.  Those are the issues the Second Circuit directed be addressed on remand.  Therefore, the analysis below follows the directives of the Second Circuit, rather than Trafalgar's meandering, repetitive, and inapplicable arguments based upon the November 6, 2008, Memorandum-Decision and Order.

[4]  The Second Circuit affirmed dismissal of Trafalgar's claims pertaining to Aetna's sale of the A and B notes to Algonquin.  401 Fed. Appx. at 587-89 (affirming 427 F. Supp. 3d 202 (N.D.N.Y. Apr. 12, 2006) and an oral decision of December 19, 2006).  It also affirmed denial of Trafalgar's motion for leave to amend its complaint and dismissal of its claims brought by adversary proceeding.  See Trafalgar Power, Inc. v. Aetna Life Ins. Co., 396 B.R. at 589-97.

than ten days after any Trafalgar executive became aware of the failure.  Yesawich Decl., Apr. 11, 2005, Ex. 1 § 7.1(b), Dkt. No. 199-4 at 6[5] ("Indenture § __, ___-_").  One provision of the Indenture required Trafalgar to keep the property free from all liens and to pay, when due, all taxes, levies, and any other charges against the property.  Id. § 3.3, 199-3 at 24.

Taken together, these sections provide that an Event of Default "shall exist" when Trafalgar failed to pay its income taxes, eventually resulting in a levy against the property, and such failure was known to any Trafalgar executive for more than ten days.  Additionally, an Event of Default would exist if there was a levy against the property of which an executive knew for at least ten days.

Corporate income taxes for the 1996 and 1997 tax years[6] were due on June 15, 1996, and June 15, 1997, respectively.  Trafalgar filed its income tax returns for 1996 and 1997, in December 1996 and December 1997, respectively, pursuant to extensions granted by the IRS.  Both tax returns reflected taxes due and owing, but Trafalgar did not pay the amounts due.  Arthur H. Steckler ("Steckler"), president of both TPI and CFC, signed the tax returns. Therefore, Steckler knew that Trafalgar had failed to pay its income taxes when due, at least for the 1996 and 1997 tax years.  Moreover, more than ten days went by after Steckler knew that Trafalgar failed to pay its income taxes when they became due.  At this point, an Event of Default existed pursuant to the Indenture.

Additionally, because of Trafalgar's continued failure to pay its income taxes, on July 1, 1999, the IRS issued a Notice of Intent to Levy with a demand for payment within thirty

---

[5]  Pinpoint cites are to the ECF page for ease of reference.

[6]  The tax years ended March 31.

days, of which Steckler was aware for at least ten days.  Trafalgar failed to make the required payment.  Again, pursuant to the Indenture, an Event of Default existed.

Trafalgar argues that Algonquin wrongly refused to pay the income tax debt and it had no right to declare that a default existed because it prevented Trafalgar from making the payment.

According to Trafalgar, Steckler directed Algonquin to pay the income tax debt when he received the Notice of Intent to Levy, but Algonquin wrongly refused to make the payment. First of all, if it was Algonquin's obligation to pay the income tax, Steckler would have requested the payment when the taxes were originally due.  Second, Trafalgar mischaracterizes Steckler's testimony.  He did not instruct Algonquin to pay the overdue income taxes.  Rather, Trafalgar's accountant told the IRS to levy against the operating fund account held by the Security Trustee.   Algonquin was directed to make the payment by the Notice of Intent to Levy served upon it by the IRS.  Yesawich Decl., Apr. 11, 2005, Ex. 1 Steckler Dep. at 200-01, Dkt. No. 332-1 at 8-9.[7]

Finally, it is clearly and unambiguously stated in the Management Agreement between Trafalgar and Algonquin that Algonquin "shall not be responsible for federal income or state income or franchise taxes of" Trafalgar.  Am. Compl. Ex. B. Dkt. No. 27-3 at 16.  Trafalgar quotes a prior sentence of this section, "[Trafalgar] shall pay and [Algonquin] shall cause to be paid . . . all real and personal property taxes for property owned, leased or rented by

---

[7]  Essentially Steckler testified that because there were sufficient funds in the operating fund held by the Security Trustee, Algonquin should have caused the Security Trustee to pay Trafalgar's overdue income taxes.  Id. at 201.  Steckler further testified that Algonquin could do so because the Management Agreement did not prohibit it.  Id.

This line of reasoning fails.  Merely because sufficient funds were in the account does not create an obligation to make a payment.  Moreover, disbursements from the operating fund were strictly specified only for payment of the debt, management expenses, and operating expenses.  Indenture § 5.3(b), 199-3 at 35 & 199-4 at 2.  Payment of Trafalgar's overdue income taxes were not specified as permitted disbursements.

[Algonquin]" in connection with operating the plants, in support of its contention that Algonquin was obligated to pay Trafalgar's income tax.  This sentence unequivocally pertains to property taxes, and not income taxes.

Therefore, notwithstanding Trafalgar's arguments to the contrary, an Event of Default existed.  Having made the first determination as directed by the Second Circuit, it now must be determined if Algonquin, as Note holder, properly exercised its rights pursuant to the parties' agreements.

### B. <u>Note Holder's Exercise of Rights after Event of Default</u>

When an Event of Default exists, the Note holder, Algonquin, may request in writing that the Security Trustee notify Trafalgar in writing that the entire balance on the notes is immediately due and payable.  Indenture § 7.2(a), 199-4 at 7-8.  By letters of July 20, 1999, and July 22, 1999, to Trafalgar, Algonquin provided written notification that an Event of Default existed and it was accelerating the notes.  According to section 7.2(a), Algonquin should have notified the Security Trustee of the Event of Default, and the Security Trustee in turn would notify Trafalgar that the notes were accelerated.  Thus, the strict terms of section 7.2(a) were not followed.  Because "Trafalgar received actual, timely notice of the acceleration" and was not prejudiced from receiving the notice from Algonquin rather than the Security Trustee, the "slight noncompliance with" section 7.2(a) was insignificant and insufficient to "warrant[] denying summary judgment or dismissing the counterclaims." Christine Falls Corp., 401 Fed. Appx. at 589-90.

Moreover, section 7.2(b) provides that, even where the procedure set forth in section 7.2(a) has not occurred, a Note holder, Algonquin, may, so long as the Event of Default exists, provide written notice to Trafalgar that declares the notes immediately due and

payable.  Indenture § 7.2(b), 199-4 at 8.  Algonquin did, with its letters of July 20, 1999, and

July 22, 1999, provide Trafalgar with written notice that an Event of Default existed and the

notes were being accelerated, as permitted by section 7.2(b).

Trafalgar argues that failure to strictly comply with section 7.2(a) did not trigger an

Event of Default, therefore precluding Algonquin from obtaining relief on its counterclaims.

This argument is defeated by the Second Circuit finding that strict noncompliance was

insufficient to warrant denial of summary judgment or dismissal of the counterclaims.  See

Christine Falls Corp., 401 Fed. Appx. at 589-90.  In addition, an Event of Default existed

when Trafalgar failed to comply with the provisions of the Indenture as set forth above and

Steckler was aware of such failure for ten days.  See Indenture § 7.1(b), 199-4 at 6.  The

requirements of notice of acceleration set forth in section 7.2 do not affect whether an Event

of Default existed.  See id. § 7.2, 199-4 at 7-8.  Rather, it was Trafalgar's failure to pay its

corporate income tax, in contravention to the provisions of the Indenture, that triggered the

Event of Default.

Trafalgar also argues that Algonquin is not entitled to the remedies provided because

it cured the default by paying Trafalgar's tax, on September 20, 1999.  This argument

completely overlooks the fact that when Algonquin notified Trafalgar that the notes were

being accelerated, an Event of Default existed, and had existed at least since Trafalgar filed

its income tax returns without paying the tax due.  Algonquin notified Trafalgar of the

acceleration on July 20 and 22, 1999, and on July 22, 1999, demanded payment of all past

due income taxes and penalties no later than August 2, 1999, to satisfy the IRS Notice of

Intent to Levy, and set forth its intent to accelerate the notes without further notice (as

permitted by the Indenture) should Trafalgar not comply.  Trafalgar did not cure the non-

payment of its taxes.  Rather, it instituted this litigation.  The Event of Default existed when Algonquin accelerated the notes.  The later payment of the taxes to remove the lien was a specifically-provided remedy in the event that a default existed,  Indenture § 7.4(b)(i), 199-4 at 9, properly exercised by Algonquin and the Security Trustee, which does not constitute a "cure" of Trafalgar's default.

Algonquin substantially complied with section 7.2(a) in that Trafalgar received actual notice and was not prejudiced thereby, entitling it to the remedies provided.  Further, Algonquin strictly complied with section 7.2(b), also entitling it to the remedies set forth.

## C. <u>Remedies</u>

It has been determined that an Event of Default occurred and Algonquin properly exercised its rights as Note holder.  Therefore, it must now be determined if Algonquin is entitled to the remedies it seeks.  If so, summary judgment on the counterclaims must be granted.  If not, the counterclaims must be dismissed.

As set forth above, as of the time that Algonquin accelerated the notes an Event of Default existed.  The notes were properly accelerated.  Thus, Algonquin is entitled to a declaration that Trafalgar is in default as to the notes and it is entitled to enforce its rights as provided in the Indenture.

As noted above, the Indenture provided that the unpaid income tax, which would have resulted in a lien against the collateral if left unpaid, could be paid, as Algonquin did.  <u>Id</u>. § 7.4(b)(i).  Additionally, the Security Trustee may take immediate possession of the Indenture Estate and dispose of it in accordance with the terms of the Indenture.  <u>Id</u>. § 7.4(b)(ii).

Algonquin first argues that the stock pledge agreements are part of the Indenture Estate.  Property included in the Indenture Estate is set forth in the granting clauses.  Id. 199-3 at 8.  Included in the description of the Indenture Estate is the following:

> It is further agreed that the Security Trustee shall hold any and all other Property and any and all other rights, interests, privileges and positions granted to it in accordance with the provisions hereof, the provisions of the Note Purchase Agreement, the Consolidation Agreement, and the provisions of any other document contemplated hereby or thereby, as security trustee for the holders, from time to time of the Notes, to have and to hold, all and singular, the aforesaid Property as security for, or as additional sources of payments of, the Indenture Indebtedness, and for the uses and purposes and subject to the terms and provisions set forth in this Indenture.

Indenture 199-3 ¶ B. at 8.  In other words, the Security Trustee was to hold as security all rights and interests contemplated by the debt restructuring documents.  The Note Purchase Agreement specifically references the Stock Pledge Agreements.  Yesawich Decl. Sept. 5, 2008, Note Purchase Agreement § 3.16, Dkt. No. 293-8 at 20.  Thus, the Stock Pledge Agreements were contemplated by the debt restructuring documents and are included in the Indenture Estate by the terms of the Indenture.  Marina pledged all of the stock in TPI as security for the restructured loans.  Algonquin's L.R. 7.1 Statement of Material Facts, Ex. C, Dkt. No. 268-8 ("Marina Pledge Agreement"); id. Ex. F, Dkt. No. 268-11 ("Marina Amended Pledge Agreement").  TPI pledged all of the stock in CFC as security for the restructured loans.  Id. Ex. D, Dkt. 268-9 ("TPI Pledge Agreement"); id. Ex. E, Dkt. No. 268-12 ("TPI Amended Pledge Agreement").  Pledge of all of the stock of TPI and CFC was a condition precedent to execution of the debt restructuring.  TPI Am. Pledge Agreement at 2.[8]

---

[8]  The language of the TPI and Marina Pledge Agreements and Amended Pledge Agreements is identical.  For simplification only the TPI documents will be cited.

In the Event of Default, the Security Trustee had "all of the rights and remedies with respect to the Stock Interests of a secured party under the Uniform Commercial Code of Connecticut."  TPI Pledge Agreement § 5.1(a).  Further, the pledged stock may be sold at a public or private sale held in accordance the terms of the pledge agreement.  Id.  The agreement also specifies how the proceeds of such sale will be applied.  Id. § 5.3.  Pursuant to the debt restructuring documents, the Note holder, Algonquin, is entitled to a declaration that it may enforce its rights against the pledged TPI and CFC stock.

## V. CONCLUSION

An Event of Default as defined by the Indenture exists.  Trafalgar was not prejudiced by Algonquin's slight non-compliance with the notice of acceleration requirements of the Indenture.  Thus, Algonquin is entitled to the appropriate remedies in the Event of Default.  Pursuant to the loan restructuring documents, Algonquin may enforce its rights in the Event of Default as against the pledged stock of TPI and CFC, including directing the Security Trustee to sell that stock and apply the proceeds of the sale in accordance with the pledge agreements.  That is, Algonquin is entitled to all of the relief it sought in its counterclaims, a declaration that Trafalgar is in default and Algonquin is entitled to enforcement against the collateral.

Accordingly, it is

ORDERED that

1.  Algonquin's motion for summary judgment on its counterclaims is GRANTED;

2.  Trafalgar is in DEFAULT under the terms of the Indenture and related loan documents; and

3.  Algonquin is entitled to enforce its rights and remedies as against the pledged collateral, including the stock of TPI and CFC.

The Clerk of the Court is directed to file an Amended Judgment accordingly and close the file.

IT IS SO ORDERED.


_____
United States District Judge


Dated:  April 3, 2012
        Utica, New York.